UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 16-cr-284 (JRT/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Brian Arthur Barthman, | |
| Defendant. | |

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1) and Local Rule 72.1, upon Defendant Brian Arthur Barthman's ("Defendant") Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 19]. The Court held a motions hearing on December 7, 2016, regarding the parties' pretrial motions.[1] At the motions hearing, the parties requested the opportunity to submit supplemental briefing, which was completed on December 27, 2016, and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 19], was then taken under advisement at that time.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 19], be **DENIED**.

I.   BACKGROUND AND STATEMENT OF FACTS

A. Background

Defendant is charged with one (1) count of possession of child pornography involving a prepubescent minor, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (Indictment [Docket No. 1]).

---

[1] The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 25].

**B. Facts**

The record presently before the Court indicates that on December 15, 2015, Hermantown School Counselor, Emily Kyllonen ("Counselor Kyllonen"), reported to St. Louis County Social Services Initial Intervention Unit that a known and identified twelve (12) year old[2] juvenile female ("C.B.") reported that she and her younger sisters were not getting breakfast and dinner, and they were not getting clean clothes. (Gov't's Ex. 1 at ¶ 5).[3] C.B. was provided clean clothes as she was reported to smell like urine. (Id.).

On December 17, 2015, Counselor Kyllonen informed Hermantown Police Resource Officer Lisa Perich ("RO Perich")[4] that Counselor Kyllonen; Sarah Anderson, a social worker; and Principal Jenny Wiese had spoken with C.B. (Id. at ¶ 6). RO Perich was further informed that C.B. had previously been interviewed by the First Witness Child Advocacy Center, but that C.B. did not want to talk to a social worker again. (Id.). RO Perich was also informed that C.B. did not feel safe at home, was worried about her five year old sister who C.B. heard getting hit by Defendant, and that Defendant had hit "her on the butt so hard it bruise[d] and that he hit C.B.'s hands too." (Id.).

On December 18, 2015, social worker Misha Alaspa ("SW Alaspa") met with C.B. to discuss clothing sizes as SW Alaspa was going to provide C.B. with clothes. (Id. at ¶ 7). At that time, C.B. told SW Alaspa that Defendant needed help with his "violence" and that he hits C.B. and her sisters on the hand and heads. (Id.). C.B. further informed SW Alaspa that she had lied to

---

[2] The application in support of the search warrant now at issue—from which the present facts are taken—provided C.B.'s date of birth, however, the Court does not recite it here.

[3] Government's Exhibit 1 is the warrant application, supporting affidavit, and warrant now at issue. At the motions hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant now at issue into evidence as Government's Exhibit 1. (December 7, 2016, Motions Hearing, Digital Recording at 10:27–10:30 a.m.).

[4] RO Perich is a resource officer at C.B.'s school. (December 7, 2016, Motions Hearing, Digital Recording at 10:30–10:32 a.m.).

the previous social worker when she had asked C.B. questions about sexual abuse. (Id.). C.B. asked what sexual abuse was, and SW Alaspa informed her that it was "when someone touches you where your swimsuit covers or asks you to touch them where their swimsuit covers." (Id.). C.B. responded "yep" and "yep," and C.B. told SW Alaspa that "her dad needs help with that and that he touches C.B. here and here" as she pointed to her chest and vagina. (Id.).

Also on December 18, 2015, after C.B.'s conversation with SW Alaspa, Laura Gapske from the First Witness Child Advocacy Center conducted a forensic interview with C.B. (Id. at ¶ 8). RO Perich monitored that interview. (Id.). During the course of that interview, C.B. states that her parents did "bad things;" her mom had "mental brain problems;" and her mom did not do what she was supposed to such as "clean, wash clothes, or make breakfast or dinner." (Id. at ¶ 9). C.B. also stated that Defendant gets mad and hits C.B. and her sisters, including an incident "a long time ago" when Defendant "slapped her on her butt and it was all bruised and it hurt." (Id.). C.B. stated that Defendant also hit C.B. with a book and when he gets mad he "covers [C.B.'s sister's] mouth with his hand." (Id.). C.B. stated that Defendant touched her "here and here" as she pointed to her chest and vaginal areas. (Id. at ¶ 10). C.B. also stated that Defendant sometimes "lays on her and she doesn't like it." (Id.). C.B. reported that Defendant "pushed me on the bed and started to hurt me." (Id. at ¶ 11).

C.B. stated that on more than one occasion Defendant started "badly massaging" her chest when she was sitting on his lap in C.B.'s sister's chair. (Id. at ¶ 12). C.B. reported that she thought the most recent time Defendant had "massaged" her chest was while C.B. was twelve years old. (Id.). C.B. further stated that Defendant asked if C.B. wanted him to massage her and she said "on her back it's good, but not anywhere private." (Id.). C.B. reported that Defendant put his hand under her pants to touch her "right here" at which time she pointed to her vaginal

area. (Id. at ¶ 13). C.B. described a particular incident stating that while she was sitting in Defendant's lap watching a Christmas movie she "stretch[ed] out her legs to get comfortable" and Defendant "put his hand down her pants and was slowly massaging" C.B.'s vaginal area. (Id.). During this particular incident C.B. thought her mom was "out somewhere and that her sisters were watching the movie with them and they saw it." (Id.). C.B. stated that the touches in her vaginal area "made her feel icky." (Id.).

C.B. reported that Defendant "puts his penis in her vagina and also that he licked her vagina" which she demonstrated with the anatomical dolls. (Id. at ¶ 14). She further reported that Defendant "put his penis on her butt" which she also demonstrated with the anatomical dolls. (Id.). C.B. stated that Defendant made her touch his penis with her hand on more than one occasion, and that he said not wearing underwear was good. (Id. at ¶¶ 14–15).

C.B. also reported that she had seen "really bad pictures that were inappropriate on [Defendant's] phone gallery," including pictures "of girls laying down and going like that and massaging like that" at which time C.B. pointed to the "private parts" of the drawings. (Id. at ¶ 16). C.B. said that the pictures sometimes have boys and massaging, but that she thought the people in the pictures "were grown ups." (Id.). She stated that Defendant asked her if she wanted to watch a "naughty video" to which she replied "no," but she thought he watched it anyways. (Id.). She further stated that while "her mom and dad have a sex video," C.B. "doesn't watch it because it's disgusting." (Id.). She reported that Defendant had other "bad videos on the phone" and on the "list" on the living room television. (Id.).

Lastly, C.B. reported that she did not feel safe at home and did not want to go back home. (Id. at ¶ 17). While she did want to go to foster care, she was afraid she would not be adopted. (Id.).

On December 21, 2015, C.B.'s six (6) year old[5] sister, A.B., participated in a forensic interview at the First Witness Child Advocacy Center. (Id. at ¶ 18). Rachel Johnson from the First Witness Child Advocacy Center conducted the interview which was monitored by RO Perich. (Id.). During the interview A.B. disclosed that one of the rules in the house "is no toughing [Defendant's] computer." (Id. at ¶ 19). A.B. reported that when the rules are broken her parents get mad. (Id.). She further explained that when Defendant gets mad he sends A.B. and her sisters to their bedrooms and when her mom gets mad she hits A.B. and her sisters and then sends them to their bedrooms.

A.B. answered "yes" when asked if anyone had ever shown her a picture or video of people without their clothes on, and "yes" when she was asked if anyone had ever taken a picture or video of her without her clothes on. (Id. at ¶ 20). When asked who had done so, A.B. responded "my family." (Id.).

On December 23, 2015, RO Perich drafted an application for a search warrant to search Defendant, a 2004 Jeep Grand Cherokee with Minnesota license plate RR004, a Blue Ford hybrid electric work car, any other vehicle driven or used by Defendant, and the premises described as an apartment at 4247 Timber Ridge Lane Unit F, Hermantown, Minnesota. (Id.).[6]

The December 23, 2015, application sought a search warrant to search for and seize the following things: any and all types of computers systems; computer disks; pornography in any

---

[5] RO Perich's affidavit in support of the search warrant application provided A.B.'s date of birth, however, the Court does not recite it here.

[6] This application for a search warrant was the second application for a search warrant RO Perich had prepared in the present case. On December 21, 2015, RO Perich applied for and received a warrant substantially similar to the warrant presently at issue except that it did not seek to search the vehicles as the December 23, 2015, application sought. (See, Gov't's Ex. 2). RO Perich testified that she obtained a second warrant to include Defendant's vehicles when she "realized that computers and other things could be transported in a vehicle and also that the Defendant works in the technology field and is often travelling in vehicles, possibly with that type of equipment, technology-type equipment and computers." (December 7, 2016, Motions Hearing, Digital Recording at 10:33–10:35 a m.). Therefore, RO Perich applied for a second warrant which included the Defendant's vehicles. (Id.). The second, December 23, 2015, warrant was the warrant executed and the operative warrant in the present case. (December 7, 2016, Motions Hearing, Digital Recording at 10:35–10:36 a m.).

form or medium; any and all materials and photographs depicting sexual conduct, nude individuals, and minors; any device capable of recording images; indicia of occupancy; paperwork showing membership or subscriptions to internet sites; and data contained on either hard drives or removable media to include deleted filed, email files that may show contacts with minors or chat room information showing conversations with minors. (Id.). The application for the search warrant provides that RO Perich was applying for the search warrant on the grounds that the property to be seized was used as a means of committing a crime; the possession of the property to be seized constitutes a crime; the property to be seized is in the possession of a person with intent to use such property as a means of committing a crime; and the property constitutes evidence, which tends to show a crime has been committed, or tends to show that a particular person has committed a crime. (Id.).

RO Perich's affidavit in support of her application for a warrant to search Defendant's person, a 2004 Jeep Grand Cherokee with Minnesota license plate RR004, a Blue Ford hybrid electric work car, any other vehicle driven or used by Defendant, and the premises described as an apartment at 4247 Timber Ridge Lane Unit F, Hermantown, Minnesota, contained RO Perich's qualifications and the details of RO Perich's investigation as set forth above, including the statements made by C.B. and A.B. (Id. at ¶¶ 1–3, 4–20).

In her application, RO Perich attested that, based on her knowledge, experience and training, it is common for persons involved in pornography to possess home computers for viewing and storing images and that "it is also common for people that are sexually attracted to children to collect nude, sexually suggestive, and sexually explicit material featuring children." (Id. at ¶ 21). RO Perich further attested that it is "common [for people sexually attracted to children] to keep photographs, diaries or other records of encounters surrounding the obsession

of having sex with minors[;]" "common for people to carry their cell phone on their person and use them to take and store pictures and videos[;]" and "common for a person to have, store, transport, and charge their cell phones or other electronic devices in their vehicle." (Id.).

RO Perich also attested in her application that she had consulted with law enforcement officers and investigators from the "ICAC Task Force" trained in computer forensics and that based on those communications RO Perich knew "that to properly retrieve and analyze electronically stored (computer/digital) data, and to insure [sic] accuracy and completeness of such data and to prevent the loss of the data either from accidental or programmed destruction, it is necessary to conduct a forensic examination of the computer and devices." (Id. at ¶ 22). RO Perich further provided in her application that to accurately and completely effect the digital search "it may also be necessary to analyze not only data storage devices, but also peripheral devices which may be interdependent, the software to operate them, and related instruction manuals containing directions concerning operation of the computer and software." (Id.). RO Perich further provided that due to the technical requirements of such a digital search and the volume and nature of electronic evidence searching the information seized from computers may require a qualified computer expert in a laboratory or other controlled environment. (Id. at ¶ 23).

RO Perich attested that the analysis of the computers, phones, and devices would be performed by a computer specialist focusing on particular programs, directories, and files that are most likely to contain the evidence and information of the violations under investigation. (Id. at ¶ 24). She further attested that due to the amount of work that needed to be performed she could not approximate the amount of time it would take to complete the examination. (Id.). In her application, RO Perich specifically requested permission for "investigators from ICAC to conduct a search of any collected phones, computers, and such devices for the purpose of

locating crimes associated to criminal sexual conduct and communications of sexually explicit materials to children." (Id. at ¶ 25).

On December 23, 2015, the Honorable Dale Harris, District Court Judge for the State of Minnesota, Sixth Judicial District, County of St. Louis, determined that probable cause existed to support the issuance of the search warrant now at issue. (Id.). The search warrant authorized a search for any and all types of computers systems; computer disks; pornography in any form or medium; any and all materials and photographs depicting sexual conduct, nude individuals, and minors; any device capable of recording images; indicia of occupancy; paperwork showing membership or subscriptions to internet sites; and data contained on either hard drives or removable media to include deleted filed, email files that may show contacts with minors, or chat room information showing conversations with minors. (Id.).

RO Perich and other officers executed the December 23, 2015, search warrant on December 23, 2015, at 2:18 p.m. (Gov't Ex. 4).[7] The Receipt, Inventory, and Return relative to the December 23, 2015, search warrant was returned on December 29, 2015. (Id.). The search warrant return provided that officers seized various electronics including two tablets, three cameras, two cell phones, video tapes, a laptop and laptop case, two black computer towers, five thumb drives, two CDR's, a synology external storage device, and two thumb drives. (Id.).

## II.   DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE. [DOCKET NO. 19].

Defendant moves the Court for an order suppressing any evidence obtained as a result of the December 23, 2015, execution of the search warrant for the premises described as 4247

---

[7] Government's Exhibit 4 is the Receipt, Inventory, and Return relative to the December 23, 2015, search warrant. At the motions hearing, the Government, without objection, offered the Receipt, Inventory, and Return into evidence as Government's Exhibit 4. (December 7, 2016, Motions Hearing, Digital Recording at 10:27–10:30 a.m.).

Timber Ridge Lane, Unit F, in Hermantown, Minnesota. (Def.'s Mot. to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 19]).

### A. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be

considered in determining the existence of probable cause.'" United States v. Wiley, No. 09–cr–239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in Wiley). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

### B. Analysis

In his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 19], Defendant argues that the evidence obtained as the result of the search warrant of his residence and the results of the forensic search of the various electronic devices seized should be suppressed because "[t]he search warrant (Exhibit 1) application, supporting affidavit, and warrant itself fails to allege facts or describe property and things that constitute contraband[,]" the warrant application's supporting affidavit fails to "present probable cause that child pornography will be present at the location on Timber Ridge Lane[,]" and "authorities . . . were never granted a valid search warrant in order to forensically analyze . . . the various devises seized." (Id.).

Defendant argues that the application and warrant executed on December 23, 2015, failed to identify that the object of the search were contraband in the form of child pornography and therefore was invalid because "a search warrant for child pornography must state that the object of the search is indeed child pornography." (Def.'s Mem., [Docket No. 26], at 2). Defendant appears to argue that as the search warrant application requested permission to search for, among

other things, "pornography in any form or medium" which includes legal pornography depicting adults and provides that the application is made on the grounds that the "possession of the property above described constitutes a crime" the warrant is invalid because the possession of pornography depicting adults does not constitute a crime. (Id.). Defendant's arguments mischaracterizes out of context portions of RO Perich's application in support of the December 23, 2015, search warrant. (See, Id.). "Pornography in any form or medium" is not the only item the search warrant sought permission to search for, and "possession of the property above described constitutes a crime" is not the only grounds on which the search warrant application was made nor was "pornography in any form or medium" the only thing described above in the search warrant application. Additionally, Defendant's argument improperly focuses on the search warrant as a warrant seeking only evidence of child pornography when RO Perich, in her application in support of the December 23, 2015, search warrant, specifically attested that she was requesting the search warrant "for the purpose of locating crimes associated to criminal sexual conduct and communications of sexually explicit materials to children." (Gov't's Ex. 1 at ¶ 25). Defendant fails to provide supporting legal authority for his proposition that the application in support of any warrant must articulate that child pornography is the specific object of the search before child pornography can be seized pursuant to such a warrant.

    Moreover, the caselaw is in opposition to Defendant's arguments.

> [A] magistrate reviewing a warrant application is charged with the duty of determining whether a "fair probability that contraband or evidence of a crime will be found in a particular place." [United States v. Hart, 544 F.3d 911, 914 (8th Cir. 2008)] (quotation omitted). Indeed, "[i]t is not necessary for an affidavit to include the name of the specific crime alleged." United States v. Summage, 481 F.3d 1075, 1078 (8th Cir. 2007), cert. denied [552 U.S. 1104] (2008). "Rather, only a *probability* of criminal conduct need be shown."

See, United States v. Alexander, 574 F.3d 484, 489 (8th Cir. 2009).

"In short, an affidavit supporting a search warrant needs to establish only that the evidence of a crime—*any* crime—will probably be found, not that the evidence of a specific crime will probably be found." United States v. Bailey, Case No. 14-cr-270 (PJS/TNL), 2015 WL 317372, *2 (D. Minn. Jan. 26, 2015). Considering the evidence in the affidavit, which clearly supported the conclusion that Defendant had molested and sexual assaulted C.B. and shown her sexual explicit materials, the state court judge could reasonably have concluded that there was a fair probability that evidence of those crimes would be found on Defendant's person and at Defendant's residence. RO Perich's affidavit in support of her application for a search warrant specifically articulates the statements of C.B. where she reported that Defendant had touched and massaged C.B.'s chest and vaginal area underneath C.B's clothing, that Defendant penetrated C.B.'s vagina with his penis, licked her vagina, placed his penis on her "butt," and shown her pictures of an inappropriate sexual nature. (Gov't's Ex. 1 at ¶¶ 7, 10, 12–13, 14, 16).

Moreover, as the Government notes, the Eighth Circuit has previously recognized "an intuitive relationship between acts such as child molestation or enticement and possession of child pornography." Colbert, 605 F.3d at 578. Indeed, in the context of the demonstrated child molestation evidence set forth in the search warrant application, it was reported that A.B. had answered "yes" when asked if members of her family had ever asked to take pictures of her without her clothes on. (Gov't's Ex. 1 at ¶ 20). To the extent the search warrant sought to search for evidence of child pornography, RO Perich's affidavit supported the conclusion that Defendant had engaged in acts of child molestation, and therefore, it would have been reasonable for Judge Harris to conclude that evidence of possession of child pornography could also presumably be found at the places to be search by the December 23, 2015, search warrant.

Upon review of RO Perich's affidavit, the Court finds that the issuing state court judge had a sufficient basis upon which to believe that probable cause existed for the issuance of the search warrant. The affidavit contains information concerning Defendant's alleged sexual assault of C.B., sexually inappropriate pictures on Defendant's phone he had allegedly shown C.B., and A.B's statement that no one was allowed to touched Defendant's computer. RO Perich also attested that—based on her training and experience—it is common for persons involved in pornography to possess home computers for viewing and storing images and that "it is also common for people that are sexually attracted to children to collect nude, sexually suggestive, and sexually explicit material featuring children." (Gov't's Ex. 1 at ¶ 21). RO Perich further attested that it is "common [for people sexually attracted to children] to keep photographs, diaries or other records of encounters surrounding the obsession of having sex with minors[;]" "common for people to carry their cell phone on their person and use them to take and store pictures and videos[;]" and "common for a person to have, store, transport, and charge their cell phones or other electronic devices in their vehicle." (Id.). The affidavit articulates a sufficient basis upon which to find that a fair probability existed to conclude that the search would uncover evidence of a crime; thus, there was probable cause to issue the warrant.

The Court reaches a similar conclusion regarding Defendant's argument that the forensic examination of the various electronic devices seized during the execution of the December 23, 2015, search warrant was done without a valid warrant as law enforcement was required to possess a separate warrant authoring such an examination. (Def.'s Mem., [Docket No. 26], at 1, 3). Defendant provides no legal support for his proposition that law enforcement was required to

obtain a second warrant before conducting a forensic examination of the seized electronic devices. (See, Id.).[8]

RO Perich's affidavit in support of her application for the December 23, 2015, search warrant specifically outlined why the evidence seized from the execution of that search warrant would need to be forensically examined, identified the organization that would be providing the computer specialist to conduct the examination, the manner in which that forensic examination would be effectuated, and requested permission for "investigators from [the] ICAC [Task Force] to conduct a search of any collected phones, computers, and such devices for the purposes of locating crimes associated to criminal sexual conduct and communications of sexually explicit materials to children." (Gov't's Ex. 1 at ¶¶ 22–25). Moreover, despite Defendant's contention that the December 23, 2015, search warrant did not authorize the search of the seized electronic devices, the December 23, 2015, search warrant signed by Judge Harris specifically authorized law enforcement to search the "[d]ata contained on either hard drives or removable media to include deleted files, email files, that may show contact with minors or chat room information showing conversations with minors." (Id.) (emphasis added).[9]

---

[8] Many of the legal citations Defendant provided, in fact, support a finding that the December 23, 2015, search warrant authorized the conducting of a forensic examination of the electronic devices seized during the execution of that warrant. See, United States v. Upham, 168 F.3d 532, 535–37 (1st Cir. 1999) (stating that a search of a computer and co-located disks was "not inherently more intrusive than the physical search of an entire house for a weapon or drugs" and allowing the scanning of an entire computer hard drive for images, including deleted images, where the search warrant only provided, in pertinent part for the seizure of "[a]ny and all computer software and hardware, . . . computer disks, disk drives [and] [a]ny and all visual depictions, in any format or media, of minors engaging in sexually explicit conduct [as defined by the statute]" without mentioning the search of the actual computer itself); United States v. Walser, 375 F.3d 981, 983–87 (10th Cir. 2001) (allowing an officer to search a computer where a search warrant granted permission to search for "controlled substances, evidence of the possession of controlled substances, . . . written or electronically stored . . . records" without any mention of a computer or the contents of a computer hard drive). The Upham court referred to defendant's argument that the search warrant authorized the search for and seizure of the computer but not the search of the computers contents as "hopeless." Upham, 168 F.3d at 537.

[9] While a separate law enforcement officer did seek to get a separate warrant on December 23, 2015, (Gov't's Ex. 3), to conduct the examination of the electronic devices seized, the Court finds no factual or legal support has been demonstrated for Defendant's assertion that law enforcement was even required to do so.

In addition, assuming solely for the sake of argument that the affidavit of RO Perich was not sufficient to establish probable cause, the Court concludes that officers relied in good faith on the probable cause determination by Judge Harris when executing the December 23, 2015, search warrant and thereafter conducting a forensic analysis of the electronic items seized in the execution of that warrant.

Although evidence obtained as a result of the execution of a warrant unsupported by probable cause is generally inadmissible, Mapp v. Ohio, 367 U.S. 643 (1961), there is an exception "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." Davis v. United States, 564 U.S. 229, 238-39 (2011) (quoting United States v. Leon, 468 U.S. 897, 922 (1984)). There are four circumstances in which the good-faith exception does not apply:

> (1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made "in reckless disregard for the truth"; (2) "the issuing magistrate judge wholly abandoned his [or her] judicial role"; (3) the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

United States v. Marion, 238 F.3d 965, 969 (2001). Here, Defendant does not contend that any of the Leon exception circumstances apply nor does he present any arguments regarding the good-faith exceptions.

The record currently before the Court shows that law enforcement's good-faith reliance on the warrant issued to search Defendant's person, the described residence, the described vehicle, and the data "contained on either hard drives or removable media" militates against suppressing the evidence obtained during the December 23, 2015, search. In her affidavit in support of her application for a search warrant, RO Perich presented specific facts indicating that

Defendant had sexually assaulted C.B., that Defendant had shown inappropriate sexual photos or videos to C.B. and A.B., and that someone in A.B.'s family had asked to take pictures of her without her clothes on. In her affidavit, RO Perich's attested that evidence of such crimes was likely to be found on Defendant's phone and computer, and it sought permission to conduct a forensic analysis of those items. And, as discussed above, the Eighth Circuit has previously recognized the intuitive link between child molestation and child pornography. Accordingly, the affidavit in support of the December 23, 2015, search warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." In addition, it did not render the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

Thus, the Court concludes that the officers involved relied in good faith on the December 23, 2015, search warrant which had been issued by Judge Harris.

Accordingly, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 19].

### III.  CONCLUSION

The Court's careful review of RO Perich's affidavit in support of her application for the December 23, 2015, search warrant indicates that she presented State District Court Judge Harris with sufficient specific facts for Judge Harris to conclude there was a substantial basis to believe that evidence of a crime could be expected to be found on Defendant's person, in his vehicles, and at the 4247 Timber Ridge Lane Unit F, Hermantown, Minnesota residence. The application and search warrant further provided probable cause to seize and conduct a forensic examination of electronic devices seized during the December 23, 2015, search at issue.

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 19], be **DENIED**

Dated: January 17, 2017            **s/ Leo I. Brisbois**
Leo I. Brisbois
U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.